Turning to the day calendar, United States v. Abu Ghraib. Thank you. Are you arguing this one? He's warmed up already. Yeah, that's fair enough. Good morning. Zoe Dillon for the appellant, Suleiman Abu Ghraib. Good morning. For me, this case is a spokesperson liability matter, and it sets a slippery slope that I think, putting aside the magnitude of the prosecution, would really set some pretty dangerous precedent were the court to sustain the convictions on the theories that the government has presented. I think the main point that I want to make here today is that aiding in any objective of a conspiracy, which is what Judge Kaplan charged the jury was the law, does not equate to intending all the consequences of a conspiracy, which I think is what this court would need to indeed sustain the convictions. Essentially, what the government is arguing is that an individual can be guilty of a murder conspiracy simply by subscribing to and propounding an ideology. But the problem there is that support for a cause, I think we would all agree, does not equal the specific intent for a conspiracy to murder. What the government essentially is trying to do is remove that ultimate objective of murder and the specific intent that is required from this entire calculus and somehow say, well, essentially, if it's a terrorism case, then it's going to meet the standard. The charge said the jury had to find an intent to aid in the accomplishment of the unlawful objective, which would be killing Americans. Well, what the court said was a few different things. That's one of the things that it said. In the same sentence, the court referred to an unlawful purpose and an unlawful objective, and in conclusion of that portion of the charge, what the court referred to was any of the conspiracy's illegal objective. And any. And the indictment that the jury was presented with, which they were given, notwithstanding the government's argue on appeal, was one that encompassed Al-Qaeda's various ideologies, which include any number of illegal objectives. And so we don't have a – I asked in the charge conference for an apprendee finding as to, you know, specifically which conspiracy the jury was unanimous on. That was declined. So we don't actually know. What's more, in defining unlawful, and here I might add the government says that I'm cherry-picking language. I'm not. I'm choosing, you know, various language from the charge at 1500 and 1504 and 1510. I'm taking it as a whole. In defining what unlawful actually meant, what the court referred to was a generalized intent and not the specific intent for murder that would be required. Essentially what's going on here is that the government is seeking a sharded definition of conspiracy. They're referring back to a 2000 case by Judge Calabresi, judge authored by Ferrarini, if I'm pronouncing it correctly, in 2000. This is picking up language that goes back to the 1980s that requires some knowledge of the unlawful aims and objectives of the scheme, and I'm quoting there from the government's brief. But the problem is that some knowledge is not going to meet the bar in a conspiracy-to-murder case. And I think if we sort of, you know, bring this back to the anchor of the argument that I'm trying to make in the context of spokesperson liability, there's really no limiting principle there, and that's the question of law that I think should very much trouble this court. The sort of last point that I want to make on the conspiracy issue is that, you know, to be clear, the court instructed the jury that it was sufficient to find an agreement which may or may not include the defendant and that subjective intent was not needed, and that was sort of the apex of the conspiracy charge. I think that should concern this court. On the question of sufficiency, look, we've got a mountain of overwhelming evidence, as we always do in a federal criminal case. The question is whether it's a mountain of overwhelming evidence on the specific points required. The government misconstrues, I think I would argue that charitably, what I'm saying with regard to foreknowledge. I'm certainly not saying that every participant in the conspiracy needs to be privy to absolutely every detail of a conspiracy under the law, although I think it might be an appropriate way for society to proceed. I concede that that's not necessarily the way things are done. All I'm arguing is that the lack of evidence with regard to Mr. Abugay's foreknowledge of any specific plot is really symptomatic of the problem and exacerbates the prejudice. Does he have to know the specific plot or just the objectives, the ultimate objectives of the plot to kill Americans? Well, I think that he would have to apprehend the objectives as a whole. Okay. And that's why I'm challenging this language that sort of trickled down from the 1980s. I think it's soft language that's ossified into the law, and I don't think it's appropriate for that reason. How specific? I mean, is it specific enough to say that he shared a general – would it be specific enough in the jury charge to say that he shared a general intent for the conspiracy to kill Americans wherever they were found? I don't think so, because 1011A requires ultimately specific intent, and that's really the problem here. We're not actually dealing, as much as the government and the court below might like to have believed, on a question of general intent. Ultimately, this is and must be a specific intent question, so I think that particular approach would be problematic for the same reasons. And so – and how would – in your view, what would have needed to – how would it have needed to be expressed in terms of specific plots or specific objectives, victim-specific? Well, the language that we had proposed – I think, actually, the government proposed it initially, or some variation of it, but in any event, it was done with the acquiescence, at the very least, of the government. It was desiring that his acts cause those consequences or knowing that those consequences are substantially certain to result from his acts, which brings me back to the point that I was initially trying to make, that aiding in any objective – and aiding is an important question here, because the government used the word help dozens of times in its summation and rebuttal – that aiding in any objective does not actually equate to intending consequences, which I think is what the Supreme Court under Ocasio has pretty clearly announced is required to sustain a conspiracy conviction. With regard to aiding and abetting, I'm not trying to bootstrap my prior arguments as the government is arguing. What I'm trying to do is hammer down the importance of these issues and how they bleed into the entire case. With respect to Rosemond, I recognize that there are distinctions between that case and this one, but the important knowledge in Rosemond comes at 1251 to 1252. I think the problem with the Court's instruction came in its description of that knowledge requirement in telling the jury to consider merely whether Rosemond knew his cohort used a firearm. The Court did not direct the jury to determine when Rosemond obtained the requisite knowledge. Here we've got a case where the government said, oh, no, it's not about September 11th, and then argued September 11th basically all the way through the trial and more or less now on appeal. We've got an appellant here where there's no real evidence that that requisite foreknowledge did occur prior to his joining the conspiracy with respect to any specific act, which brings me to the final point that I wanted to make on the dismissal. This is more than just a speech argument. We are not arguing a First Amendment defense here. What I'm focusing the arguments with respect to the dismissal of the indictment as to Counts 2 and 3, which incidentally were tacked on at the very end of the case a couple of months before trial, is that, again, the ultimate goal has to be, the ultimate articulation has to be as to any specific violent crimes. And we just don't have that specificity here. It's nebulous and it's unclear, and it really was all through the district court. And I think that the specter of terrorism and the past history, as tragic and as horrifying as it is, do not equate to the future knowledge and the specificity required under the law. You've reserved rebuttal. Yes, thank you. And then we'll hear you then. Thank you. Good morning again, Your Honors. Michael Ferrara for the government. I also represented the government throughout the proceedings in the district court. Your Honors, I think Ms. Dolan and I came away with very different impressions from this trial. Abu Ghaith was a core member of Al-Qaeda. This was not someone who stumbled into a conspiracy. This is not someone who unwittingly helped. This is a man who moved his family to Afghanistan to meet Osama bin Laden because Osama bin Laden was involved in jihad activities, and Abu Ghaith was interested in that and wanted to meet him. He understood that bin Laden was a suspect in the U.S. embassy bombings, in the attack on the USS Cole, and he sought him out. He then, at bin Laden's request, started to speak at guest houses and training camps of Al-Qaeda. He did not speak at the religious institute. He spoke at training camps. And then, just before September 11th, knowing that something big was coming from Al-Qaeda, that was his testimony, he evacuated his family from Afghanistan. He himself remained there because he believed he had things to do in the days ahead. That's his testimony. On September 12th, 2001, 16 years ago today, bin Laden summoned him to the mountains of Afghanistan, and Abu Ghaith made a video recording with bin Laden and two other Al-Qaeda members, Ayman al-Zawahiri and Abu Hafs al-Masri, in which he praised the September 11th attacks and exhorted individuals to Al-Qaeda's cause. The evidence that he understood that Al-Qaeda was involved in killing Americans, that its primary goal was to kill Americans, was overwhelming. It was overwhelming before September 11th, but as of September 11th, there was absolutely no doubt that he understood that Al-Qaeda, the purpose was to kill Americans. I understand what you're arguing. In other words, he knew what was going on, and he played a role in raising the level of the awareness of Al-Qaeda and its purpose, and so, therefore, that's proof that he shared in its purpose, which was to kill Americans. And he heard me ask your opponent whether it had to be any more specific than that. I take it you say it does not. It does not, Your Honor, and that, for instance, is, you know, we would cite to Ocasio for that, which talks about the idea that the government does not have to prove that the defendant intended to commit the underlying offense himself. Here, Judge Kaplan's instructions— That doesn't go to specificity, though. I mean, I think her argument is that just the fact that Al-Qaeda was interested in killing Americans isn't enough, that he has to have—his intent has to be a bit more specific either. I mean, I couldn't—I was trying to glean from her what she was specifically arguing. Does it have to be target-specific, or does its purpose have to be more specified in some way beyond just a general purpose of hating or thinking that Americans should be killed as some kind of religious principle? I don't think it has to be more specific than that. I think Judge Kaplan's instruction really captured—was a correct statement of the law. And what he told the jury was that what was necessary was the defendant participated in the conspiracy with knowledge of its unlawful purpose and with an intent to aid in the accomplishment of its unlawful objective. That's what I want to ask about, the aiding. What is the proof that—I mean, your theory is that he recruited people, right? Or he assisted in the recruiting of people? He both provided himself as personnel to Al-Qaeda and recruited other personnel to Al-Qaeda, yes. So you say part of it is just himself being a part of it and being a part of the information machine that served a function of Al-Qaeda. Correct. All right. And I didn't see in your opponent's brief that they were questioning that there was an absence of proof that he actually did recruit people, because, I mean, the testimony shows that he spoke at these camps that were set up by Al-Qaeda training centers, right? So we had his own statements that he spoke at training camps. We had his own statement, which he made in a post-arrest to a special agent of the FBI, that he understood bin Laden wanted him to recruit. We also had testimony from a cooperator, Al-Wan, who said that he bumped into Abu Ghaith at a guest house in Kandahar, and while there, Abu Ghaith encouraged him to give a biot to bin Laden, those sorts of things, yes. And then throughout, of course, post-September 11th, and I just want to say, just to go back to Your Honor's question, so I think that, number one, Judge Kaplan's instruction accurately captured what the jury had to find. Now, to go to just a little more evidence, even if Abu Ghaith had to know specifically what Al-Qaeda was going to do, there was sufficient evidence of that as well. That's not the standard, but we proved it. For instance, he said in his testimony that he knew there was something big coming from Al-Qaeda in the days leading up to September 11th. He evacuated his family from Afghanistan leading up to September 11th. That's one thing. The jury could infer he understood that September 11th was about to happen. Put that to one side. The storm of airplanes threats. The storm of airplanes threats in speeches he made at least three times, in various speeches, he referred to the storm of airplanes, encouraged Muslims and people who didn't agree with the United States to stay out of tall buildings, to stay off airplanes, and he was threatening specifically nationals of the United Kingdom and the United States. In fact, at the time he was making those threats, the evidence showed he was in the place with the people who were plotting the shoe bomb, the Richard Reed shoe bomb plot in which Richard Reed attempted to detonate a bomb in his shoe on a flight from the United Kingdom to the United States. So he was absolutely flagging precisely what was coming next. Did we have a direct link? No. But the circumstantial evidence allowed the jury to infer that he understood that plot and what was coming. So even if we had to prove that, Your Honor, we did. So what we have is we have a properly instructed jury. We have overwhelming evidence. The only other thing I wanted to touch on briefly was the Rosemond instruction or the purported Rosemond error. There was no error. Judge Kaplan testified. Let me back up. I think the animating spirit of Rosemond is that if we're going to hold someone liable as an aider and abetter, we want to make sure they know what they're aiding and abetting. Here, Judge Kaplan instructed the jury that an aider and abetter must know that the crime is being committed and must act in a way that's intended to bring about the success of the criminal venture. That is on all fours with Rosemond. There was no error in that instruction. And, again, in any event, that would be harmless based on all of the evidence that I've already outlined and that we included in our brief. Unless there are other questions, we'll rest. Mr. Farrar, I just have a kind of clerical question. I'm trying to, with regard to the caption, this indictment was filed on September 21, 1998, I guess. This is the famous indictment which includes many people who have surfaced in latter years. Is that right? So the original indictment, yes, was against, for instance, Osama bin Laden, Ayman al-Zawiyah. This was the indictment that was once captioned, USA versus bin Laden. That's correct, Your Honor. And so do I understand that as you find and prosecute various people, these names disappear from this indictment, the caption? Your Honor, when we indicted this case, yes, it was a superseder of the bin Laden indictment, but we only included Abu Ghaith in the caption. Perhaps that was a clerical error, but it seems similar at the time. Yeah, yeah, yeah. And Mr. al-Haj has provided his name to many of these cases. Yes, that's definitely true, Your Honor. Correct. All right. Just trying to get the context.  Thank you. Thank you, Your Honor. Please, Joan. So the evidence that the government has seized upon here with respect to the shoe bombing conspiracy that was happening, interestingly, I'd like to note that they adopted my compartmentalization argument in their brief, and now in oral argument they're essentially arguing against that idea of compartmentalization. This organization, like I think any organization of its nature, is highly compartmentalized, and that's part of the problem with respect to the ultimate objectives and the totality of the conspiracy that I'm arguing. Just a couple of points. Mr. Abu Ghaith did not, as Mr. Ferrara just argued, move his family to Afghanistan to meet Osama bin Laden. That was not the purpose. There's no evidence of that in the record at trial. He moved to Afghanistan for religious reasons because he was interested in the government of the Taliban and Islamic governance of that type. It was Osama bin Laden who wanted to use Mr. Abu Ghaith for his oratorical skills, which had become known throughout the Middle East and the Islamic world. With regard to recruiting, I'd just like to, if the Court's going to focus on that in determining the case ultimately, examine the record. Mr. Abu Ghaith did not recruit individuals into terrorist training camps in the mountains of Afghanistan. That's not what he did. That's not the evidence in the case. What he did was speak about religious aspects, and he did it on a very limited number of occasions. So we're not talking actually about someone who, as Mr. Ferrara just argued, was a core member of al-Qaeda, notwithstanding the fact that I have to deal with evidence where he was on a video sitting with Mr. bin Laden in a cave in Afghanistan 16 years ago. Today, nevertheless, that doesn't mean that he knew what was going on to the threshold that would be required to sustain these convictions. And on that note, I would just like to note that from the government's own witness, this is at transcript page 1008, I elicited testimony that there was in fact no reference to any specific future act of terrorism in any of the videos or the speeches that the government introduced at trial or has referenced in court here today. Thank you. Thank you both. Reserve decision. Thank you.